ISBELL, JONATHAN, as Administrator of the Estate of Steven A. Kelson, Deceased v. UNION PACIFIC RAILROAD COMPANY, et al. - rec'd 01/04/01

(text box: 1) NO. 5-99-0558

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________

JONATHAN ISBELL, as Administrator of the ) Appeal from the

Estate of Steven A. Kelso, Deceased, ) Circuit Court of

) Madison County.  

Plaintiff-Appellee, )

) 

v. ) No. 96-L-182

)

UNION PACIFIC RAILROAD COMPANY, )

)

Defendant-Appellant, )

)

DONALD F. CAIN and MISSOURI PACIFIC )

RAILROAD COMPANY, d/b/a UNION )

PACIFIC RAILROAD COMPANY, ) Honorable

) Randall A. Bono, 

Defendants.   ) Judge, presiding.  

___________________________________________________________________________

JUSTICE HOPKINS delivered the opinion of the court:  

Union Pacific Railroad Company (defendant), appeals a jury verdict for Jonathan Isbell (plaintiff) as administrator of the estate of Steven A. Kelso, in plaintiff's cause of action for negligence against defendant.  Plaintiff's counts against Donald F. Cain and Missouri Pacific Railroad Company were dismissed at the trial, so defendant and plaintiff are the only parties in this appeal.  Plaintiff's cause of action arose out of a fatal collision on December 12, 1995, as Steven drove his employer's truck south on Springfield Road.  Steven's truck was struck by defendant's eastbound train at the Springfield Road crossing, which also is owned by defendant.  The jury found that defendant was negligent and awarded plaintiff $2.5 million in damages; however, the jury reduced the award by 50% because of Steven's negligence.  Defendant appeals.  

On appeal, defendant contends that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict (a) because plaintiff's claim that there were inadequate warning signs at the crossing was preempted by Federal law and (b) because plaintiff failed to prove that defendant's negligence was the proximate cause of Steven's death.  In addition, defendant contends that the trial court erred in numerous evidentiary rulings, that the trial court failed to take judicial notice of statutes regulating crossings, that reversible errors occurred during closing arguments, that the court erred in allowing and refusing certain jury instructions, that the cumulative effect of the trial errors deprived defendant of a fair trial, and that the jury's verdict was excessive.  We affirm for the reasons set forth below.  

FACTS

The following evidence pertinent to the issues was adduced at the trial: Thomas Allen, a contractor, testified that his business and his residence are located at the corner of Springfield Road and Miller Road, about one-half mile north of the Springfield Road crossing.  On December 12, 1995, Steven delivered automotive parts to Allen's place of business.    

Allen stated that he is very familiar with the Springfield Road crossing as he has lived and worked in the area since 1964.  Allen described the crossing as deceiving, and he explained:  "[I am] not quite sure what it is about [the crossing], but it seems like you're on the crossing [before you know it].  There is quite a grade change there.  And if you're going from north to south, you can see the train cars off in the distance to your right.  But I think you tend to lose focus of where the engine is."  

Allen also testified that one of his employees had an accident in 1988 at the Springfield Road crossing, while the employee was driving one of Allen's trucks.  After the accident, Allen told his employees not to go over the Springfield Road crossing.  Allen stated that when crops are growing, the crops visually obstruct the crossing.  Allen also stated that it is more difficult to see a train when traveling north on Springfield Road than when driving south, because there are some buildings, trees, a residence, and shrubbery on the right side of the road, south of the crossing, that obstruct the view.   Allen knew of two other prior accidents involving a train and motor vehicle at the Springfield Road crossing.  On cross-examination, Allen admitted that he did not witness the two other accidents. 

Sergeant Michael Strong of the Madison County sheriff's office testified that he was dispatched to Steven's accident on December 12, 1995, about 2:11 that afternoon.  Officer Strong inspected the area to determine the cause of the accident.  Officer Strong noted that the railroad tracks are about eight feet lower than the road as you approach the crossing.  Officer Strong found nothing that would totally obstruct Steven's view of the train, but he stated that there were a few tall weeds in the farmer's field to the west of the crossing.  Officer Strong also thought that the sun "possibly" affected Steven's view, as the sun was low in the sky and fairly bright.  Officer Strong did not know why Steven did not stop for the train.  Officer Strong found skid marks north of the crossing that could have been made by Steven's pickup truck. 

Ronald Stubblefield, a locomotive engineer for the Burlington Northern Railroad in 1994, testified that he occasionally used defendant's Springfield Road crossing.  Stubblefield explained that when he uses defendant's railroad tracks, he notifies defendant's dispatcher so that defendant knows that he is on its tracks.  In June 1994, Stubblefield was involved in a collision with a pickup truck at the Springfield Road crossing.  Stubblefield reported the accident to defendant.  

Carl Smith, an employee of Norfolk Western for approximately 27 years, testified that a speed tape from a locomotive is equivalent to a black box on an airplane because it is an event recorder that gives data that occurred during a given period.  Smith stated that from 1979 until he retired in 1995, he reviewed speed tapes about once a week.  Smith explained that speed tapes are used to determine if an engineer contributed to an accident or if the engineer performed his duties properly.  

Smith reviewed the speed tape from defendant's train that collided with Steven's truck.  He determined that in the 16 seconds immediately before the collision, the locomotive traveled at 62 miles per hour for eight seconds and 61 miles per hour for another eight seconds.  Smith stated that the train was placed in full emergency when it was traveling 62 miles per hour.  Smith also explained that a train's speed can be converted into feet per second.  According to Smith, if the train had been going 60 miles per hour, the maximum speed allowed for a train on these tracks, for the 16 seconds that the train was going more than 60 miles per hour, there would have been a 35.12-feet difference.  

On cross-examination, Smith admitted that it takes a long time for a train to slow down, because of the length of a train.  Smith also admitted that the train traveled at 58 miles per hour for four seconds shortly before the collision.  

Donald Cain, the engineer who operated defendant's train on December 12, 1995, testified that he did not see Steven's truck prior to the collision.  Cain became aware of a problem when Charles Cudworth put the train in emergency.  Cain was sitting in the front seat on the right side of the locomotive, the opposite side from Steven's path of travel, and Cudworth was sitting in the front seat on the left side of the locomotive.  Although there are windows on each side and in the front of the locomotive, Cain could not see to the left as Cudworth blocked his view.  

Cain explained that an engineer of a train operates the throttle, brake, and whistle of the locomotive.  On December 12, 1995, Cudworth was learning the route, and Cain was showing Cudworth the terrain and informing him where the signal locations were.  

Cain stated that he would not have done anything differently even if he had known the prior accident history of the Springfield Road crossing.  Cain also stated that he has more than 80 crossings in his territory and that he does not know what has happened at any of the crossings.    

Cain testified that he was watching the speedometer on December 12, 1995, and he did not see the speedometer exceed 60 miles per hour.  Cain stated that the grade of the track at this crossing is downhill.  In addition to watching the speedometer, Cain was sounding the whistle and watching two crossings, Smith Road and Springfield Road, which are less than a quarter of a mile apart, to make sure there was no oncoming traffic and that the crossings were clear.  Cain explained that as a train approaches a crossing, the view is more limited and  restricted.  

Cain saw hunters along the tracks near the crossing on December 12, 1995.  Cain blew the train whistle to warn the hunters of the train's approach.     

Bobby Williams, the conductor on defendant's train on December 12, 1995, testified that he did not see Steven's truck before the collision as he was watching for the next signal to see if the train was cleared to proceed.  Williams sat behind Cudworth on the left side of the locomotive.  Williams had to lean to the right to see around Cudworth and out of the front of the train.  Williams saw Steven's truck after Cudworth grabbed the emergency brake.  According to Williams, the train stopped about a half to three-quarters of a mile past the crossing.  

Williams did not personally believe that 2 miles per hour over the 60 miles-per-hour speed limit would have made a difference in this accident because even at 60 miles per hour it would have taken a long time to stop the train.  Williams also did not think that it was important for him to know the accident history of a crossing, as he has the same duties to perform at every crossing.  

Cudworth testified that he has been a locomotive engineer since 1968.  Cudworth saw Steven's truck when Steven was about 400 feet from the crossing.  It appeared to Cudworth that Steven was braking, but then Steven "gunned" his truck and pulled in front of the train.  At that time, Cudworth reached for the emergency brake.  When Cudworth saw Steven initially brake, he presumed that Steven was going to stop.  Cudworth stated that all he can do to avoid an accident is place a train in emergency.

Cudworth acknowledged that trains have speed restrictions.  Cudworth also stated that he treats all crossings as dangerous.  Cudworth explained that the grade of the land, the weight on the train, and the locomotive's power affect a train's stopping time.  Cudworth stated that even at 60 miles per hour, it takes a normal train about a mile to stop.  

John Leick, senior claims specialist for defendant, investigated Steven's accident.  Leick stated that approximately 278 of defendant's trains and 106 Burlington Northern trains used the Springfield Road crossing during the 30 days prior to Steven's accident. 

Stanley McLaughlin, vice president of defendant's quality and process improvements, testified through an evidence deposition.  McLaughlin's testimony established that defendant has no independent program for inspecting and evaluating crossings to determine if the warning devices at a crossing are adequate, if additional warning devices are needed, or what type of warning device should be installed. 

Dr. John Baerwald, a traffic engineer, testified as an expert witness concerning whether crossings are extrahazardous and whether warning devices at a crossing are adequate.  Dr. Baerwald stated that there are two types of warning devices available for crossings, passive and active.  Dr. Baerwald described passive warnings as crossbucks–circular, yellow signs with an "X" and "RR" on it–and stop signs.  Dr. Baerwald stated that passive warnings do not advise a motorist if a train is coming or is on the crossing but only tell the motorist that there are train tracks ahead.  In contrast, active warnings notify a motorist if a train is coming or is on the crossing.  Active warnings are flashing lights or flashing lights accompanied by short-arm gates.  Dr. Baerwald stated that active warnings give a driver "positive guidance."  Dr. Baerwald testified that a 1989 report indicated that if flashing lights are placed at railroad crossings, accidents are reduced by 77% and that when both flashing lights and gates are installed at a crossing, accidents are reduced by 86%.  Dr. Baerwald explained that a train whistle is a supplementary warning that depends upon a driver's ability to hear it and to discern from what direction a train is coming.

Dr. Baerwald stated that in evaluating a crossing, the visual obstructions in all four quadrants of a crossing must be considered, and ideally, a driver should have a straight, unobstructed approach well in advance of a crossing.  Sharp turns, angles, or curves present a problem.  Also, a driver should be able to see a sufficient distance down a railroad track so that at a certain decision point a driver can decide if a train is coming.  Dr. Baerwald explained that State and Federal tables have been developed to determine how far a motorist should be able to see so he can decide whether he should stop at a crossing.  In the case 
sub judice
, where the motorist has a maximum speed of 55 miles per hour and the train has a maximum speed of 60 miles per hour, a driver should be able to see 700 feet down the railroad tracks when he is 565 feet from the outer rail of the crossing. 

Dr. Baerwald formed his opinion regarding the Springfield Road crossing after he reviewed depositions, statements, the accident report of this accident, accident reports of previous accidents, communications from government bodies, the traffic-count information provided by the county, and the train traffic information provided by the railroad.  Dr. Baerwald also made three visits to the accident scene.  In Dr. Baerwald's opinion, the Springfield Road crossing is extrahazardous.  According to Dr. Baerwald, any crossing where a train and a motor vehicle can be at a crossing at the same time is a hazard.  The hazard increases as the number of vehicles and trains using the crossing increases.  At the Springfield Road crossing, approximately 400 vehicles per day and 8 to 18 trains per day used the crossing.  Both the trains (60 miles per hour) and the vehicles (55 miles per hour) travel at high speeds at the crossing.  Additionally, the angle of the train tracks to the road is 61 degrees rather than the desired angle of 90 degrees, which contributes to the hazard.  The train tracks are at a lower elevation than the surrounding land, allowing a motorist to see only part of the train at 565 feet from the crossing.  

The Springfield Road crossing contains view obstructions in all four quadrants:  in the southeast quadrant there are residential and other buildings and trees; in the northeast quadrant there is a line of trees that are 31 feet high approximately 600 feet from the tracks; and in all quadrants there are crops, a seasonal obstruction.  Dr. Baerwald explained that a motorist must be concerned with at least two quadrants, the right and the left, because until the train is seen, a motorist does not know from which direction the train is coming even if the driver hears the train's whistle.  Another factor Dr. Baerwald considered was that the placement of the crossbucks on the north side of the tracks was 39 feet from the rail.  Federal regulations require crossbucks to be 12 to 15 feet from the rail, while State regulations require crossbucks to be 8½ to 15 feet from the rail.  Because the crossbucks were farther from the Springfield Road crossing than allowed by law, Dr. Baerwald believed that this confused Steven as he would expect the rail to be shortly after the crossbucks and would induce Steven to think that the tracks were closer than they actually were. 

Dr. Baerwald stated that the accident history of the Springfield Road crossing contributes to his determination that the crossing is extrahazardous and that a motorist cannot make a reasonable and accurate evaluation as to whether it is safe to proceed across the crossing.  Dr. Baerwald further stated that the passive warnings were inadequate for the extrahazardous crossing and that positive guidance was needed.  Dr. Baerwald was of the opinion that the Springfield Road crossing should have, at a minimum, flashing lights and, preferably, flashing lights and gates.  In the interim, until active warnings are installed, the crossing should have a stop sign or a flagman.  According to Dr. Baerwald, a railroad can obtain permission from the various government bodies to install active warnings.  It was Dr. Baerwald's opinion that the extrahazardous nature of the crossing and the inadequate warnings at the crossing contributed to Steven's accident.  

On cross-examination, Dr. Baerwald explained that even though the 61-degree angle of the train placed the train more within Steven's field of vision, because the train is in a head-on position, it is harder for a motorist to estimate the speed of a train.

Steven's parents, Evelyn and Robert Kelso, testified as to their relationship with Steven.  Neither of them depended upon Steven for financial support.  Evelyn saw Steven about three times a month.  Steven helped Evelyn cut her grass and fix her car, and he performed other activities around the house that she could not do herself.  Evelyn and Steven went out to dinner and shopping.  Steven worked at McKay's Auto Body, and he had plans to marry Holly Bergman.  Evelyn testified that she missed her son's society and companionship very much.  

  Robert and Steven worked on cars, went swimming, and rode motorcycles together.  Steven lived with Robert at the time of Steven's death.  Robert also testified as to Steven's careful habits when driving over railroad tracks.  According to Robert, when Steven came to railroad tracks, he would slow down and look in both directions.  

Holly Bergman corroborated that she and Steven were engaged to be married and that Steven was careful when he drove over railroad tracks.  

Plaintiff introduced into evidence, over defendant's objection, four newspaper articles regarding other accidents between trains and motor vehicles at the Springfield Road crossing.  One article was from 
the June 23, 1994, edition of the Alton Telegraph.  The other three articles were from the Edwardsville Intelligencer–one from August 16, 1971, one from September 6, 1988, and one from June 23, 1994.   

Following this evidence, the jury found defendant to be negligent and awarded plaintiff $2.5 million in damages.  As noted previously, the jury also determined that Steven was 50% contributorily negligent and reduced plaintiff's damages  accordingly.  Defendant appeals.  

ANALYSIS

I.  Court erred in not granting judgment notwithstanding the verdict.  

a.  Federal preemption.

Defendant contends that it was entitled to a judgment notwithstanding the verdict  because the Federal Highway Safety Act of 1973 (FHSA) (23 U.S.C. §101 
et seq.
 (1996)) provides that when Federal funds are used in an improvement project, a plaintiff's State-law claim that a crossing has inadequate warnings is preempted under the Federal Railroad Safety Act (FRSA) (49 U.S.C. §20106
 
(1996)).  Defendant claims that the Springfield Road crossing was designated to be improved with flashing lights and gates in March 1995 and that there was an agreement for preliminary engineering for the improvements between it and the Illinois Department of Transportation (IDOT).  Defendant asserts that because Federal funds were used to pay for the preliminary engineering work for the crossing improvements, plaintiff's claim that it failed to provide adequate warning signs at the crossing is preempted under Federal law.  Specifically, defendant contends that sections 646.214(b)(3) and (4) of Title 23 of the Code of Federal Regulations (23 C.F.R. §§646.214(b)(3), (4) (1996)) covers the subject of inadequate warning devices and that, therefore, plaintiff's claim is preempted.  Because this is a matter of law, we review the issue 
de novo.  Hubeny v. Chairse
, 305 Ill. App. 3d 1038 (1999).  

Here, the record reveals that in March 1995, before Steven's accident, a "letter of understanding" was sent by the IDOT to defendant.  The letter recited that some projects involving defendant's railroad, including an upgrade of the Springfield Road crossing with flashing lights and gates, had been selected for upgrades in the coming fiscal year.  The letter further provided that the railroad could begin preliminary engineering on the projects and that the cost of the preliminary engineering work would be borne by the State "subject to the reimbursement by the Federal Highway Administration."  The March 1995 letter of understanding was to be executed by defendant, but the letter admitted into evidence at the trial was unsigned.  There was nothing properly admitted into the record to reflect when defendant executed the agreement and nothing to show when or if defendant was paid Federal funds for the preliminary engineering report for the Springfield Road crossing.  Another document in the record reflects that, as of November 19, 1997, almost two years after Steven's accident, construction had not yet commenced on the upgrade of the Springfield Road crossing.

 The FRSA was adopted in 1970 "to promote safety in every area of railroad operations and to reduce railroad-related accidents."  49 U.S.C. §20101 (1996).  Under the FRSA, the Secretary of Transportation is given broad powers to prescribe rules and regulations with respect to railroad safety.  49 U.S.C. §20103 (1996).  Once the Secretary prescribes a regulation covering a subject matter, a State's regulation of that area is preempted unless the State's regulation is necessary to eliminate or reduce a local safety hazard, is compatible with Federal law, and does not unreasonably burden interstate commerce.  49 U.S.C. §20106 (1996).  Pursuant to the Federal law, sections 646.214(b)(3) and (4) were promulgated by the Federal Department of Transportation and provide as follows:

"(b) Grade crossing improvements.

* * *

(3)(i) 'Adequate warning devices', under §646.214(b)(2) or on any  project where Federal-aid funds participate in the installation of the devices[,] are to include automatic gates with flashing light signals when one or more of the following conditions exist:

* * *

(4) For crossings where the requirements of §646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of [the Federal Highway Administration]."  23 C.F.R. §§646.214(b)(3), (4) (2000).

The issue raised in this case by defendant was addressed by the United States Supreme Court in 
CSX Transportation, Inc. v. Easterwood
, 507 U.S. 658, 123 L. Ed. 2d 387, 113 S. Ct. 1732 (1993).  In 
Easterwood,
 the Supreme Court determined that, when applicable, Federal preemption applies under sections 646.214 (b)(3) and (4) to a plaintiff's cause of action for State law negligence when Federal-aid funds participate in the installation of warning devices, as these regulations cover the subject of the adequacy of warning devices.  
Easterwood
, 507 U.S. 658, 123 L. Ed. 2d at 400, 113 S. Ct. 1732.  For Federal preemption to be applicable, the condition of the regulations must be met.  
Easterwood
, 507 U.S. 658, 123 L. Ed. 2d at 401, 113 S. Ct. 1732.  The Supreme Court is reluctant to interpret a Federal statute pertaining to a subject traditionally governed by State law as preempting State law, and preemption will not lie unless it is the clear and manifest purpose of Congress.  
Easterwood
, 507 U.S. 658, 123 L. Ed. 2d at 396, 113 S. Ct. 1732.  

The Supreme Court in 
Easterwood
 held that the condition of the regulations, 
i.e.
, that Federal funds participate in the improvement at the crossing, was not met because the installment of motion-detection circuitry
 did not meet the regulations' definition of warning devices, because the Federal funds earmarked for the installation of gate arms at the crossing were transferred to another project, and because the installation of the gate arms at that particular crossing was placed on a list of projects to be considered at a later time.  
Easterwood
, 507 U.S. 658, 123 L. Ed. 2d at 402, 113 S. Ct. 1732.  Therefore, the Supreme Court in 
Easterwood
 held that the plaintiff's State negligence action was not preempted by Federal law.  
Easterwood
, 507 U.S. 658, 123 L. Ed. 2d at 402, 113 S. Ct. 1732. 

At least three subsequent Federal cases have applied 
Easterwood
.  In 
Hatfield v. Burlington Northern R.R. Co.
, 64 F.3d 559 (10
th
 Cir. 1995), the United States Court of Appeals, Tenth Circuit, determined that under Federal law, the commitment of Federal resources for, and the completion of, a preliminary engineering report on a Federally reimbursable project constitutes significant Federal participation sufficient to preempt a plaintiff's cause of action for negligence based upon a claim of inadequate warning devices. 

In contrast, in 
St. Louis Southwestern Ry. Co. v. Malone Freight Lines, Inc.
, 39 F.3d 864 (8
th
 Cir. 1994), the United States Court of Appeals, Eighth Circuit, held that a preemption of a State claim of negligence does not occur until a Federally approved upgrade is installed and operating, rather than when the plan is approved and subject to reimbursement by Federal funds.  
St. Louis Southwestern Ry. Co.
, 39 F.3d at 867.  In 
St. Louis Southwestern Ry. Co.
, the State and the Federal Highway Administration approved a preliminary engineering report and plan by the railway, and the State agency issued a work order authorizing the railway to proceed with installation.  Actual construction of the project began, but was not completed, four days before the plaintiff's accident at the crossing.  
St. Louis Southwestern Ry. Co., 
39 F.3d at 866.  The court of appeals explained its reasoning in 
St. Louis Southwestern Ry. Co
. as follows:

"Before preemption, the public is protected by a railroad's State common-law duty of care.  After installation of Federally mandated warning devices, the public is protected by those devices.  A plan to install devices and Federal approval of a plan do not protect the public, however.  The Railway's interpretation that Federal approval triggers preemption would leave the public unprotected between the time of approval and the time the prescribed devices are installed and operating.  This can be a substantial period of time.  In this case, it was fifteen months.  To encourage prompt installation of Federally prescribed warning devices, a railroad's common-law duty of care must continue until those devices are installed."  
St. Louis Southwestern Ry. Co.
, 39 F.3d at 867.  

Similarly, in 
Thiele v. Norfolk & Western Ry. Co.
, 68 F.3d 179, 183 (7
th
 Cir. 1995), the United States Court of Appeals, Seventh Circuit, held that when section 646.214(b)(3) or (4) applies to a crossing upgrade, there is no preemption of State-law adequacy-of-warning devices claims until the devices are installed and fully operational.  The court of appeals in 
Thiele
 
stated: 

"The conclusion of 
Easterwood
 supports our conclusion.  ***

Our conclusion also conforms to common sense because otherwise the public would be unprotected by either State or Federal law for the period between Federal approval and actual warning device installation. ***

Moreover, adopting the rule [Norfolk & Western] proposes would mean that for projects where the Federal government approved warning devices or prescribed them for a particular crossing, but for some reason the project was never completed ***, the public would be unprotected indefinitely, even though nothing had actually changed at the crossing.  That would hardly fit with the FRSA's goal of increasing safety at railroad crossings."  
Thiele
, 68 F. 3d at 184.

In the case 
sub judice
, defendant's argument is identical to the issue decided in the foregoing cases, and defendant, too, urges this court to determine that a State claim for inadequate warning devices is preempted by Federal law when plans for an upgrade of a crossing have been approved and the expenses reimbursed even though the construction of the upgrade has not commenced.  We decline to do so and find that plaintiff's claim that there were inadequate warning devices at the crossing is not preempted by Federal law.     

In declining to find that plaintiff's negligence claims are preempted by Federal law, we find the reasoning of 
St. Louis Southwestern Ry. Co.
 and 
Thiele
 persuasive.   We, too, believe that to hold that plaintiff's negligence claim was Federally preempted would wreak a great injustice.  If we hold that Federal preemption occurred when defendant was given approval for and had been paid Federal funds for the preliminary engineering report on the upgrade at the crossing, then any person injured or killed at the Springfield Road crossing would have no legal recourse until such time as the upgrade of the crossing was completed.  This court does not know if that crossing is as yet upgraded, five years later.  As stated in 
St. Louis Southwestern Ry. Co.
, the imposition of common law liability on the railroad until such time as an upgrade is completed and operational encourages the railroad to complete the upgrade.  
St. Louis Southwestern Ry. Co.
, 39 F.3d at 867. 

[The following text is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).]

b.  Proximate cause.

Defendant next contends that the court erred in not granting its motion for judgment notwithstanding the verdict based upon the evidence.  Defendant's argument is three-pronged:  that plaintiff failed to show (1) that defendant's failure to provide adequate warnings, 
i.e.
, flashing lights and gates, at the Springfield Road crossing was a proximate cause of Steven's death, (2) that defendant's crew's failure to keep a proper lookout was a proximate cause of Steven's death, or (3) that the speed of the train was the proximate cause of Steven's death.  

We first consider defendant's argument that plaintiff failed to prove that the warning devices at the Springfield Road crossing were inadequate and that the inadequacy of the devices was a proximate cause of Steven's death.  Defendant contends that it is undisputed that Steven saw and reacted to the train when he was at least 400 feet from the crossing, as indicated by his braking of his vehicle.  Further, defendant states that Baerwald testified that a person would have to make a decision on how to respond to the train when he was 565 feet from the crossing and that the evidence reflected that at least 10 to 12 feet of the train was visible at that point and that, thus, Steven should have seen the train and reacted in sufficient time to stop.  Therefore, defendant claims that because Steven made the wrong decision in attempting to cross the tracks in front of the train, it was Steven's negligence and not the inadequacy of the warning devices that was the proximate cause of the accident and that defendant is entitled to a judgment notwithstanding the verdict.    

Judgments notwithstanding the verdict should be entered in those cases in which all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494 (1967); 
Hernandez v. Schittek
, 305 Ill. App. 3d 925 (1999).  A judgment notwithstanding the verdict is inappropriate where reasonable minds may differ as to inferences or conclusions to be drawn from the facts presented, where the evidence demonstrates a substantial factual dispute, or where the assessment of witness credibility or the resolution of conflicting evidence is decisive to the outcome.  
Hernandez
, 305 Ill. App. 3d at 930.

In negligence cases, a plaintiff must prove all the elements of his cause of action–that the defendant owed a duty of care, that the defendant breached that duty, and that the defendant's breach of duty was the proximate cause of the plaintiff's injuries.  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107 (1995).  The existence of a duty is a matter of law for the court to decide, but a breach of duty and proximate cause are factual matters for a jury to decide.  
Espinoza
, 165 Ill. 2d at 114.  A railroad has a duty to provide adequate warnings to a motorist at a crossing that a train is approaching.  
Espinoza
, 165 Ill. 2d at 120; 
Sheahan v. Northeast Illinois Regional Commuter R.R. Corp.
, 212 Ill. App. 3d 732 (1991).  A trial court's ruling on a motion for judgment notwithstanding the verdict is reviewed 
de novo
.  
Hernandez
, 305 Ill. App. 3d at 930.  

In the case 
sub judice
, defendant contends that plaintiff failed to prove that defendant breached its duty to provide adequate warnings at the Springfield Road crossing.  Defendant claims that because Steven saw the train before he reached the crossing, it was Steven's failure to stop that was the proximate cause of his accident.  In considering this issue, we view the evidence in the light most favorable to plaintiff.  

At the trial, the evidence established that the Springfield Road crossing was an extrahazardous crossing because the tracks are situated lower than the land around it, thereby partially concealing the train; because the train tracks intersected the road at a 61-degree angle, making the view of the approaching train more of a headlong view and making it more difficult for a person to judge the speed of an oncoming train; because the view of an approaching train is always obstructed in some quadrants of the crossing and partially obstructed on a seasonal basis; because the crossing is a high-volume traffic crossing for trains and vehicles; and because the trains and vehicles travel at high speed limits.  Plaintiff's expert stated that as a result of the crossing being extrahazardous, positive guidance, which is provided by active warnings rather than passive warnings, are needed at this crossing.  Allen's testimony also corroborated that the crossing was problematic, as the crossing is deceiving.  Officer Strong's testimony raised the possibility that the sun was in Steven's eyes at the time of the accident, further obscuring his view of the oncoming train.  A reasonable jury could infer from this evidence that defendant breached its duty by not providing adequate warnings–flashing lights and gates–at the Springfield Road crossing.  It is also a reasonable inference that had Steven seen flashing lights and gates at the crossing, rather than relying on his senses alone, the accident would not have happened.  Even though Steven's actions may have contributed to the accident, a trier of fact is not precluded from finding that defendant's failure to provide adequate warnings at the crossing proximately caused the accident as well.  
Lindquist v. Chicago & Northwestern Transportation Co.
, 309 Ill. App. 3d 275 (1999).  The jury decides the issue of proximate cause based on the facts presented, and we cannot say that the jury erred in finding defendant negligent based on the foregoing evidence.  The trial court's refusal to grant defendant's motion for judgment notwithstanding the verdict was proper.   

Defendant also contends that it was entitled to a judgment notwithstanding the verdict because plaintiff did not show that the train crew's failure to keep a proper lookout or the train's speed was the proximate cause of Steven's accident.  Although we may agree with these contentions, we need not consider whether a judgment notwithstanding the verdict would be appropriate based on those arguments, because the jury's verdict that defendant was negligent when it failed to provide adequate warnings at the crossing was sufficient to deny defendant's motion for judgment notwithstanding the verdict.  

II.  Evidentiary errors.  

a.  Careful-habits testimony.

Defendant contends that the court abused its discretion when it allowed testimony as to Steven's careful habits when he drove over railroad crossings.  Defendant argues that this is reversible error because habit testimony is inadmissible when there is an eyewitness to the event.  Defendant claims that because Cudworth was an eyewitness to the event, the testimony of Steven's careful habits was inadmissible.  Defendant also asserts that the error was compounded when the jury was instructed as to Steven's careful habits.  

The admission of evidence is a matter left to the discretion of a trial court, and absent an abuse of discretion, a trial court's ruling on the admission of evidence will not be reversed on review.  
Grewe v. West Washington County Unit District #10
, 303 Ill. App. 3d 299 (1999).  Careful-habits testimony is inadmissible when there is an eyewitness to an occurrence.  
Frankenthal v. Grand Trunk Western R.R. Co., 
120 Ill. App. 3d 409 (1983).  A habit is defined as a settled way of doing a particular thing, 
i.e.
, a person's regular response to a repeated, specific situation becomes semiautomatic.  
Grewe
, 303 Ill. App. 3d at 306.  To admit habit evidence, an adequate foundation showing that the habitual response has become semiautomatic must be laid, and if the testimony is too vague, general, and ambiguous, the evidence should not be allowed.  
Grewe
, 303 Ill. App. 3d at 307.  

Here, Robert testified that it was Steven's habit to slow down and look in both directions when he came to railroad tracks.  Holly testified that Steven was "careful" when he drove over railroad tracks.  This testimony was too vague and general, and the foundation laid was insufficient to allow this testimony of careful habits.  Thus, we agree with defendant that the admission of the evidence was error; however, the error is harmless. 

An error is not reversible unless it is shown that the error was substantially prejudicial and thereby unduly affected the outcome of the trial.  
Schaffner v. Chicago & North Western Transportation Co
., 161 Ill. App. 3d 742 (1987), 
aff'd,
 129 Ill. 2d 1 (1989).  When a party claims error, it is that party's responsibility to make a clear showing of prejudice.  
Schaffner
, 161 Ill. App. 3d at 754.  Here, defendant does not allege prejudice, but it simply contends that the admission of the evidence is reversible error.  This court will not presume that the error affected the outcome of the trial.  
Schaffner
, 161 Ill. App. 3d at 754.  Since the jury determined that Steven was 50% contributorily negligent, we cannot find that defendant was prejudiced by the admission of the vague assertions that Steven had careful habits.  The jury obviously believed that, at least on this occasion, Steven lacked due care when he gunned his truck to get across the railroad tracks. 

Defendant also contends that the error of admitting evidence of Steven's careful habits was compounded by the giving of an instruction based upon that evidence.  At the trial, the following instruction was given:

"If you decide there is evidence tending to show that Steven Kelso was a person of careful habits, you may infer that he was in the exercise of ordinary care for his safety and for the safety of others at and before the time of the occurrence, unless the inference is overcome by other evidence.  In deciding the issue of the exercise of ordinary care by the decedent[,] you may consider this inference and any other evidence upon the subject of the [
sic
] Steven Kelso's care." 

Even though the jury was instructed on Steven's careful habits, the giving of the instruction was harmless error, just as the admission of the evidence was harmless.  

The instructions given to a jury are a matter of discretion left to the trial court.  
Hajian v. Holy Family Hospital
, 273 Ill. App. 3d 932 (1995).  Giving an improper instruction will result in a new trial only when the party objecting to the instruction shows that he is seriously prejudiced.  
Hajian
, 273 Ill. App. 3d at 937.  A jury is properly instructed when, as a whole, the instructions are not misleading, are sufficiently clear, and fairly and correctly state the law.  
Hajian
, 273 Ill. App. 3d at 937.  Here, defendant failed to show that it suffered prejudice by the giving of the careful-habits instruction, as the instructions in this case, when viewed as a whole, adequately informed the jury as to the law.   

b.  Evidence of prior accidents.

Defendant contends that the admission of evidence of prior accidents at the Springfield Road crossing, which were dissimilar to Steven's accident, was error.  Defendant argues that the evidence was irrelevant to the issue of notice, that the evidence was more prejudicial than probative, and that details of the prior accidents were improperly admitted. 

The admission of evidence is a matter of discretion left to the trial court, and a court's ruling on the admissibility of evidence will not be overturned on review absent an abuse of discretion.  
Templeton v. Chicago & North Western Transportation Co.
, 257 Ill. App. 3d 42 (1993).  The evidence of prior accidents is admissible if it is relevant to a proponent's case.  
Henderson v. Illinois Central Gulf R.R. Co.,
 114 Ill. App. 3d 754 (1983).  Evidence of dissimilar prior accidents is admissible to show the generally hazardous nature of the site and a defendant's knowledge of this fact; however, details of dissimilar prior accidents are irrelevant, unfairly prejudicial to a defendant, and inadmissible.  
Henderson
, 114 Ill. App. 3d at 758. 

Here, plaintiff introduced into evidence the testimony of Allen, who testified generally that he knew of two other accidents at the Springfield Road crossing.  Allen did not testify to any details of the accidents.  Similarly, Stubblefield testified about an accident involving his train and a vehicle at the Springfield Road crossing in 1994, but again, he gave no details.  Four newspaper articles that reported prior accidents at the Springfield Road crossing were admitted into evidence; however, the newspaper articles were not published to the jury, and the jury was not given details about the prior accidents from the newspaper articles.  

The record reflects that plaintiff offered the evidence of the dissimilar prior accidents to show that defendant had notice of the generally hazardous condition of the crossing and not to show that a particular condition of the crossing was hazardous.  Such evidence is allowed under the case law set forth above.  Further, plaintiff's expert, Baerwald, testified that he considered a crossing's prior accident history as a factor in determining whether the crossing was extrahazardous.  Thus, the evidence of the prior dissimilar accidents, which excluded details about the accidents, was admissible because the evidence was relevant to these issues.  Additionally, the evidence was more probative than prejudicial.  As discussed above, the evidence was relevant and was probative of the issues.  Further, because the details of the accidents were not admitted at the trial and because the evidence on the prior accidents was limited, there was no prejudice to defendant.  The trial court did not abuse its discretion in allowing the evidence of the prior dissimilar accidents and refusing to admit details of the accidents.    

c.  Photographs.

Defendant claims that the trial court abused its discretion in refusing to admit photographs taken by their investigator on the day after Steven's accident.  Defendant has not included those photographs in our record, so we cannot properly evaluate this issue.  It is incumbent upon the appellant to furnish a complete record.  
Murphy v. Chestnut Mountain Lodge, Inc.
, 124 Ill. App. 3d 508 (1984).  Without evidence to the contrary, a reviewing court must assume that the trial court acted in conformity with the law and that it had before it facts which supported its ruling.  
Murphy
, 124 Ill. App. 3d at 510.   

d.  Inadmissible testimony.

Defendant argues that Allen's testimony regarding the dangerousness of the Springfield Road crossing was inadmissible because Allen was not qualified as an expert to give such an opinion, because his testimony was irrelevant, and because the evidence was overly prejudicial due to plaintiff's comments about it in closing argument.  Defendant also contends that the admission of McLaughlin's testimony was an abuse of discretion because the evidence about upgraded crossing protection is preempted by Federal law and, in addition, his testimony was irrelevant.  

Allen's testimony was about his own experience at the Springfield Road crossing.  He explained 
that the crossing is deceiving because it is difficult to determine the speed of an oncoming train and there are visual obstructions when approaching the crossing.  This evidence was relevant to the issue of whether the crossing is extrahazardous.  Allen was not testifying as an expert witness so it was unnecessary to qualify him as such.  Allen's testimony was about his own experience, not his opinion, and his testimony could help the jury to understand the extrahazardousness of the crossing.  Therefore, the court did not abuse its discretion when it admitted Allen's testimony.  

Defendant claims that the admission of Allen's testimony was overly prejudicial because plaintiff commented upon Allen's testimony in closing argument.  As plaintiff correctly notes, defendant did not object to plaintiff's statements in closing argument, and it did not raise this specific objection in its posttrial motion.  The failure to object and to raise the error in a posttrial motion waives the issue.  
Thompson v. Lietz
, 95 Ill. App. 3d 384 (1981). 

Defendant also claims that the admission of McLaughlin's testimony was reversible error because his testimony was irrelevant and because the evidence only served to inflame the passions of the jury.  As noted previously, a trial court has the discretion to admit evidence, and its determination of relevancy of the evidence will not be overturned on review unless its ruling is an abuse of discretion.  
Templeton
, 257 Ill. App. 3d at 47.  Here, we find that McLaughlin's testimony, consisting mainly of the fact that defendant had no policy in place for evaluating crossings, was irrelevant as it did not prove or disprove a disputed fact or render any matter in issue more or less probable.  However, although the admission of the testimony was error, it was harmless because the evidence was not closely balanced and because the error was an insignificant part of the trial.  See 
Mayol v. Summers, Watson & Kimpel
, 223 Ill. App. 3d 794 (1992).  

Defendant also argues that the error in admitting McLaughlin's testimony was compounded by the court's refusal of three jury instructions that defendant tendered.  We will consider this portion of the issue later, along with other issues raised regarding jury instructions.  

III.  Judicial notice of statutes.

Defendant claims that the trial court committed reversible error in refusing to take judicial notice of, and to allow it to publish to the jury, statutes relating to the regulation of grade crossings, the exclusive authority of the Illinois Commerce Commission over grade crossings, and the ability of defendant to place a stop sign at a crossing.  Defendant argues that the trial court's refusal is contrary to law.  See 735 ILCS 5/8-1001 (1998).   Specifically, the statutes of which defendant requested the court take judicial notice were sections 11-304, 11-310(a), (c), and (g), and 18c-7401 of the Illinois Vehicle Code (625 ILCS 5/11-304, 11-310(a), (c), (g), 18c-7401 (1998)).  Defendant claims that these statutes were necessary and relevant because they explained a railroad's obligations with respect to grade crossings and because the statutes would explain McLaughlin's testimony.   

Judicial notice operates as an evidentiary concept to admit matters into evidence without formal proof.  
National Aircraft Leasing, Ltd. v. American Airlines, Inc.
, 74 Ill. App. 3d 1014 (1979).  Because judicial notice is an evidentiary concept, the rules regarding the  admission or refusal of evidence apply.  Thus, it follows that if the evidence of the statutes is irrelevant, a court has the discretion to refuse to take judicial notice of them just as it would any irrelevant evidence.  Here, the statutes defendant sought to have the court take judicial notice of were irrelevant as plaintiff's cause of action was based upon common law negligence.  The statutes only delineate what government agency had authority to place or had authority to permit placement or alteration of warnings; however, the statutes do not preclude a railroad from seeking permission to do so on its own.  These statutes do not eliminate the railroad's duty to provide adequate warnings at its crossings.  Thus, the statutes were irrelevant to defendant's duty, and for the court to take judicial notice of the statutes and publish the statutes to the jury would only have misled and confused the jury.  The court did not abuse its discretion in refusing to take judicial notice of the statutes defendant tendered for admission.  

IV.  Closing arguments.

Defendant claims that the court erred in not sustaining its objections to plaintiff's closing argument wherein plaintiff compared the value of Steven's life to that of a fighter plane pilot and to Shaquille O'Neal, a professional basketball player.  Defendant contends that the comparisons made by plaintiff in closing argument were inflammatory and prejudicial.  Further, defendant asserts that closing argument is limited to comments on the evidence presented and reasonable inferences that can be drawn from the evidence and that plaintiff's closing argument's comparisons were not based on the evidence or any reasonable inferences therefrom.  

The portion of plaintiff's closing argument to which defendant takes exception is as follows:  

"The only thing the law allows in a case like this is damages, and the damages are for the parents' loss of society, their loss of companionship with their son.  There is [
sic
] some other elements of damages His [H]onor is going to tell you about, but those are the key ones.

How do you go about putting a value on that?  Well, there is [
sic
] some clues we could take.  We've got an airplane called the F18A.  The last time I checked the F18A, and this is a couple of years back probably[,] [i]t might be more[,] [b]ut the last time I checked it cost forty-five million dollars to build an F18A.  But you know.  You know what every one of those F18A's is equipped with?  Every single one of the those forty-five[-]million[-]dollar fighter planes is equipped with one button, and that's called the eject button because our government has decided that the life of those young pilots is much more important than the value of that forty-five[-]million[-]dollar airplane.

* * *

And every one of those pilots is instructed that if they are in trouble and they can't control the plane, they push that eject button.  It blows them out of the cockpit and saves their life.  That's a value that came to mind.  Then there is [
sic
] some frivolous areas of what things are worth nowadays.  Yesterday's sports section had basketball player, professional basketball player by the name of Shaqueill [
sic
] O'Neal, and he was getting seventeen million bucks a year. ***

Anyway, Shaqueill [
sic
] O'Neal gets seventeen million dollars, and we know Michael Jordan made a lot more.  What does this tell us?  What is the companionship of your only son worth? ***."

We agree with defendant that plaintiff's statements in closing argument were error.  The statements compared plaintiff's losses with the loss of an airplane and with the annual salary of a professional basketball player, rather than focus on the loss that Steven's parents suffered.  See 
Goad v. Evans
, 191 Ill. App. 3d 283 (1989).  The argument was not based upon evidence of record or reasonable inferences therefrom.  However, although the argument is error, it is not reversible error.  See 
Goad
, 191 Ill. App. 3d at 310.  Defendant raised this issue in its posttrial motion, and the trial court determined that the argument was not prejudicial error when the trial court denied defendant's posttrial motion.  A trial court's ruling is entitled to great weight and will not be lightly set aside on appeal.  
Goad
, 191 Ill. App. 3d at 310.  Further, the size of the jury's verdict does not reflect that plaintiff's argument caused the jury to disregard the evidence and return an excessive verdict in plaintiff's favor. 

The second issue raised by defendant regarding closing arguments is that the trial court erred when it refused to allow defendant to use its Exhibit N in closing argument.  Exhibit N is a document containing excerpts of plaintiff's opening statement, which defendant asserts were judicial admissions of counsel.  Exhibit N stated, in its entirety, as follows, except for the bracketed material:

"And Mr. Williams, the conductor, he's not looking at all.  He's going down flipping, doing paperwork.  Now, keep in mind there will be 

. . .

depressed.  At some point, it goes down eight feet below the level of the roadway.  Now an engine is fourteen to sixteen feet high.  That means you don't get to see the entire engine.  You get to see the top half of it assuming that there is nothing else going to get in your way like the sun.  So you have that of the train, and you could only see the top half of the train.  In some places, you could maybe have seen more.   In some places, you could maybe have seen all of it.  But it was in and out of a ditch.

. . .

Now there is another thing that we know.  That right before this crossing Steven possibly made what was probably a fatal mistake on his part.  He hit the brakes again.  He probably made the wrong decision hitting those brakes because if he had gone on through without braking [
sic
].  But you see there was another problem[.]

. . .

Now should Steve had seen that train as he approached that crossing?  Certainly it was visible.  I don't know.  I think the evidence is going to show, if you believe[–]

. . ."  

At the trial, the court refused to allow defendant to use the above-mentioned exhibit, finding that the excerpts did not constitute judicial admissions by plaintiff's counsel.  While it is true that a clear admission of a material fact by counsel in opening statements is binding on his client, what constitutes a judicial admission is to be decided under the circumstances in each case.  
Augenstein v. Pulley
, 191 Ill. App. 3d 664 (1989).  Before a statement is held to be an admission, a statement must be given a meaning consistent with the context in which it is found.  
Augenstein
, 191 Ill. App. 3d at 671.  

Here, we do not find that plaintiff's statements were judicial admissions binding on plaintiff.  The attorney commented on the visibility of the train but did not comment on where or if Steven saw the train.  These statements are not a judicial admission that Steven saw the train.  Further, while plaintiff commented that Steven's actions were a mistake, this, too, is not a judicial admission when the statement is placed in context.  Plaintiff stated in his opening statement that there was another problem–that Steven did not have adequate warning at the crossing to make a reasonable decision.  So when considered in context, plaintiff was not conceding that Steven made a mistake, but plaintiff was stating that Steven could not make a proper decision given the nature of the crossing.  The trial court properly refused defendant's request to use exhibit N because the statements by plaintiff's counsel were not judicial admissions.  

V.  Jury instructions.

Defendant claims that there were errors in the jury instructions, both in the ones given and in those refused.  Before discussing the various instructions, we note that the standard for the review of jury instructions is as follows:  The purpose of jury instructions is to give the jury a comprehensive and accurate statement of the law applicable to the case.  
Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.
, 273 Ill. App. 3d 977 (1995).  In considering the propriety of the given instructions, a reviewing court must consider the instructions as a whole.  
Solich
, 273 Ill. App. 3d at 988.  Reversible error in jury instructions results only when the instructions misled the jury or when the refusal of an instruction has seriously prejudiced a party thereby denying him of his right to a fair trial.  
Solich
, 273 Ill. App. 3d at 988.  

a.  Plaintiff's instructions given.

Defendant argues that giving plaintiff's nonpattern jury instruction number 31A was error because the instruction was an incorrect statement of the law and because the pattern instructions correctly stated the law, so the instruction was unnecessary.  Instruction 31A stated as follows:

"It was the duty of the defendant, Union Pacific, to provide adequate warning devices at its crossing."

In support of its argument, defendant cites to 
Bassett v. Burlington Northern R.R. Co.
, 131 Ill. App. 3d 807 (1985), where a similar jury instruction was held to be erroneous.  

In 
Bassett
, this court determined that the second portion of the instruction was an inaccurate statement of the law.  The first portion of the instruction given in 
Bassett
 stated that it was the railroad's duty to provide adequate warning devices at a crossing; however, the second paragraph of the instruction stated: "Where a crossing is more than ordinarily hazardous or extrahazardous, the railroad has a duty to provide automatic electronic flashing light signals at the crossing."  
Bassett
, 131 Ill. App. 3d at 812.  The second portion was held to impermissibly encroach on the jury's function and was erroneous.  
Bassett
, 131 Ill. App. 3d at 812.  This court did not determine in 
Bassett
 that the first portion of the jury instruction given was an erroneous statement of the law or that it was error to give that portion of the instruction.  
Bassett
, 131 Ill. App. 3d at 812-13.  

In the case 
sub judice
, the jury instruction given did not contain a second paragraph as given in 
Bassett
, and the jury instruction, as given, was a correct statement of the common law.  See 
Bassett
, 131 Ill. App. 3d at 811.  The jury instruction did not encroach on the jury's province of determining breach of duty and proximate cause.  

Defendant also argues that the giving of instruction 31A was unnecessary as another jury instruction adequately stated defendant's general duty, 
i.e.
, to use ordinary care for Steven's safety.  The giving of an instruction of a general statement of duty was insufficient in this case because it was the failure to perform the specific duty that was the basis for plaintiff's claim of defendant's negligence.  The giving of instruction 31A was necessary.  The trial court properly instructed the jury when it gave instruction 31A.

Defendant claims that giving plaintiff's instruction 16, the issues instruction, was erroneous because the instruction was not supported by the evidence and was repetitious.   An issues instruction is to inform the jury of a plaintiff's claims and a defendant's responses and is taken from a plaintiff's complaint and a defendant's answer.  
Arellano v. SGL Abrasives
, 246 Ill. App. 3d 1002 (1993).  An issues instruction is proper as long as it succinctly states the issues without undue repetition or emphasis.  
Arellano
, 246 Ill. App. 3d at 1011.  A jury instruction should not be given where there is no evidence on which to base the instructions.  
Arellano
, 246 Ill. App. 3d at 1011.

In the issues instruction given here, plaintiff's claims that defendant was negligent were stated as follows:

"(a) failing to provide adequate warning signals at said crossing when it knew or should have known the crossing was extrahazardous; or

(b) operating its train in excess of the speed limit when it knew or should have known it was traveling through an extrahazardous crossing; or

(c) failing to slow or attempt to slow its train in a timely manner when it knew or should have known that Steven Kelso's [
sic
] was in imminent peril; or

(d) failing to keep a proper lookout when it knew or should have known of the extrahazardous nature of the crossing; or 

(e) operating its train at a rate of speed too fast for the class of track at the crossing; or

(f) failing to keep a proper lookout."

Defendant claims that paragraph (a) of the instruction should not have been given because this issue was preempted by Federal law.  We have already considered the preemption argument, so we need not address that further.  Paragraph (a) of the instruction was proper. 

Defendant claims that paragraphs (b) and (e) and paragraphs (d) and (f) are repetitious of each other respectively.  We disagree.  One paragraph states the issue generally, and the other paragraph includes the assertion that the acts were negligent based upon the knowledge of the extrahazardous nature of the crossing.  The language relating to the extrahazardous nature of the crossing placed an additional condition on the general proposition, so the issues were not repetitive and were not misleading for the jury.  

Defendant also contends that plaintiff failed to present any evidence that these allegations were a proximate cause of the accident.  At the trial, plaintiff's expert testified as to the inadequacy of the warning signals and how that caused the accident.  The speed tape taken from the train was entered into evidence, and testimony was presented about it.  The speed tape reflected that the train was in excess of the speed limit prior to the accident for at least 16 seconds.  Plaintiff's evidence also established that only Cudworth saw Steven's truck prior to the collision.  This evidence was sufficient to justify giving the issues instruction, and giving the instruction was not erroneous.  

Defendant argues that plaintiff's two instructions on agency should not have been given because they were repetitive and served only to unduly emphasize plaintiff's case and mislead the jury.  The instructions given were based on Illinois Pattern Jury Instructions, Civil, Nos. 50.02 and 50.11 (3d ed. 1994) (hereinafter IPI Civil Nos. 50.02 and 50.11).  The version of IPI Civil No. 50.02 given in this case provided that Cain, Williams, and Cudworth were agents for defendant at the time of the accident and that their acts were the acts of defendant.  The version of IPI Civil No. 50.11 given here provided that defendant is a corporation and that any act committed by an officer or employee in the scope of his employment is the act of the corporation.  These instructions state two different propositions and were not repetitive.  

Defendant states that because the notes on use for IPI Civil No. 50.11 and 50.02 both indicate that IPI Civil No. 50.11 "may be given in lieu of" IPI Civil No. 50.02 when the agent is an officer of the defendant corporation, giving the two instructions was repetitive.  A careful reading reveals that the notes on use specify that the "may be given in lieu of" language applies when the agent is an 
officer
 of the corporation.  The evidence at the trial did not show that Cain, Williams, or Cudworth was an officer of defendant.  Therefore, the giving of both instructions was not repetitive, was proper, and did not mislead the jury.  

Defendant contends that two of plaintiff's instructions, Nos. 27 and 28, were improper because these instructions were not supported by the evidence presented at the trial.  Plaintiff's instruction No. 27 stated that the Federal regulation concerning the speed for a Class 4 track is 60 miles per hour and that if the jury found that defendant violated the regulation, it could consider that fact along with the other facts to determine defendant's negligence.  Plaintiff's instruction No. 28 set forth a State regulation–that crossbucks are to be placed not less than 8½ feet nor more than 15 feet from the nearest rail.  Again, the instruction included the language that if the jury determined that defendant had violated the regulation, then this fact could be considered along with other facts to determine if defendant was negligent.  There was evidence in the record to support giving  these instructions.  The Federal regulation concerning track speed limits was admitted into evidence.  Further, Dr. Baerwald discussed both the 60-miles-per-hour speed limit for the train, and he also stated at the trial that crossbucks are not to be placed less than 8½ feet  nor more than 15 feet from the nearest rail.  Giving these instructions was proper.  

b.  Defendant's refused instructions.

Defendant contends that the court's refusal of three of its tendered jury instructions was reversible error.  All three of defendant's tendered instructions concerned the fact that installation of other warning signs required the permission or an order from certain government agencies, 
i.e.
, the Illinois Commerce Commission or a local authority.  While these instructions may be a correct statement of State and local regulations, they were misleading as they suggested that defendant was not negligent because the responsibility for providing adequate warning signs lies with these agencies and not with defendant.  The common law is that defendant is the entity responsible for providing adequate warning devices.  Therefore, the court properly refused defendant's tendered instructions as misleading. 

VI.  Cumulative error.

Defendant asserts that the cumulative effect of the numerous errors deprived it of a fair trial and requires a reversal and a remandment for a new trial.  A trial need not be totally free of error, but a reviewing court must determine whether there was any error that prejudiced the appellant or affected the outcome of the trial.  
Solich
, 273 Ill. App. 3d at 987.  If a case is close on its facts, any substantial error that might have tipped the scales in favor of the successful party calls for a reversal.  
Solich
, 273 Ill. App. 3d at 988. 

Here, we have found no substantial errors that call for a reversal.  Further, we do not  find the case a close one on its facts.   Lastly, while there were errors committed at the trial, none of the errors prejudiced defendant or affected the outcome of the trial.  Defendant was not deprived of a fair trial.  

VII.  Jury verdict excessive.

Lastly, defendant contends that the jury's verdict was excessive given the evidence of the relationship between Steven and his parents and that the verdict was based on passion, sympathy, and prejudice.  Therefore, defendant claims that it is entitled to either a new trial or a remittitur of $2 million.  

An award of damages in a wrongful-death action is within the discretion of a jury.  
Brown v. Arco Petroleum Products Co.
, 195 Ill. App. 3d 563 (1989).  On review, a court must scrutinize the record to determine whether the amount of a verdict is so large as to indicate passion and prejudice.  
Brown
, 195 Ill. App. 3d at 572.  Parents are entitled to a rebuttable presumption of substantial pecuniary loss upon the death of a child.  
Simmons v. University of Chicago Hospitals & Clinics
, 247 Ill. App. 3d 177 (1993), 
aff'd
, 162 Ill. 2d 1 (1994).  

In this case, we do not find the damages awarded to Steven's parents to be excessive.  Steven and his parents had a loving and close relationship.  Steven was 20 years of age at the time of his death, so his parents expected to have many years to enjoy their relationship with him.  Steven lived with his father and saw his mother at least three times a month.  Steven helped his mother with the maintenance of her home and car.  Additionally, Steven was Robert and Evelyn's only child.  The jury's verdict was not excessive, nor was it the result of passion and prejudice.  

Because we find that the jury's award was not excessive and was justified under the facts of this case, a remittitur of $2 million is not justified.  See 
Slater v. Jacobs
, 56 Ill. App. 3d 636 (1977).  

[The preceding text is nonpublishable under Supreme Court Rule 23.]

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.  

Affirmed.  

GOLDENHERSH and KUEHN, JJ., concur.

NO. 5-99-0558

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________

JONATHAN ISBELL, as Administrator of the ) Appeal from the

Estate of Steven A. Kelso, Deceased, ) Circuit Court of

) Madison County.  

Plaintiff-Appellee, )

) 

v. ) No. 96-L-182

)

UNION PACIFIC RAILROAD COMPANY, )

)

Defendant-Appellant, )

)

DONALD F. CAIN and MISSOURI PACIFIC )

RAILROAD COMPANY, d/b/a UNION )

PACIFIC RAILROAD COMPANY, ) Honorable

) Randall A. Bono, 

Defendants.   ) Judge, presiding.  

___________________________________________________________________________

Opinion Filed
: January 25, 2001

___________________________________________________________________________

Justices
: Honorable Terrence J. Hopkins, J.

Honorable Richard P. Goldenhersh, J.

Honorable Clyde L. Kuehn, J.

Concur

___________________________________________________________________________

Attorneys
 Thomas E. Jones, Leslie G. Offergeld, Walker & Williams, P.C.,

for
 4343 West Main Street, Belleville, IL 62226; Dan H. Ball, Kurt E.

Appellant
 Reitz, Ann C. Barron, Thompson Coburn LLP, 525 West Main Street,

P. O. Box 750, Belleville, IL 62222-0750

___________________________________________________________________________

Attorneys
 Jon G. Carlson, Eric J. Carlson, Carlson & Carlson, P.C., 90

for
 Edwardsville Professional Park, P. O. Box 527, Edwardsville,

Appellee
 IL 62025

___________________________________________________________________________

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 01/25/01.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.